UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOSEPH JACKSON BAXTER,<br><br>               Plaintiff,<br><br>v.<br><br>IVY MEDICAL,<br><br>               Defendant. | Case No. 1:20-cv-00342-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

This is a civil rights action brought by Plaintiff Joseph Jackson Baxter, a prisoner in the custody of the Idaho Department of Correction ("IDOC"). Plaintiff sues Defendant Ivy Medical, PLLC, which provided Plaintiff with medical treatment when Plaintiff was held in the Twin Falls County Jail from August to November 2019. Plaintiff claims that the post-surgical treatment he received for his broken jaw was constitutionally inadequate. More specifically, Plaintiff alleges that the medical care he received after a first jaw surgery was deficient, caused Plaintiff severe pain, and necessitated a second jaw surgery.

Pending before the Court is Defendant's Motion for Summary Judgment. *See* Dkt. 20. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument is unnecessary. *See* D. Idaho Loc. Civ. R. 7.1. Accordingly, the Court

enters the following Order granting the Motion for Summary Judgment and dismissing this case.

## PRELIMINARY MOTIONS

In addition to the Motion for Summary Judgment, several other motions are also pending: (1) Plaintiff's Motion to Amend (Dkt. 34); (2) Plaintiff's Motion to Strike Discovery (Dkt. 35); (3) Defendant's Motion to Strike Plaintiff's Statement of Facts (Dkt. 33); and (4) Defendant's Motion to Strike Plaintiff's Sur-reply (Dkt. 41). The Court will address each of them in turn.

**1.      Plaintiff's Motion to Amend Civil Rights Complaint**

Plaintiff seeks amendment to add certain unidentified parties to this lawsuit. *See Mot. to Amend*, Dkt. 34, at 1 ("Plaintiff would like to amend his complaint and name the individuals who failed to provide appropriate medical care and treatment to Plaintiff ….").

Plaintiff's request for amendment will be denied for several reasons. First, Plaintiff did not submit a proposed amended complaint along with his Motion to Amend, in violation of Local Rule 15.1 ("Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must reproduce the entire pleading as amended. The proposed amended pleading must be submitted at the time of filing a motion to amend."). Second, Plaintiff has not identified the parties whom he intends to add as defendants in this action. The Court cannot determine

whether amendment would be futile without an actual amendment naming the parties to be sued. *See Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) ("Futility alone can justify the denial of a motion to amend.").

Finally, Plaintiff has not shown good cause to amend. Pursuant to the Court's previous order, all amendments were due to be filed, along with a motion to amend, no later than Monday, June 7, 2021. *Succ. Rev. Order*, Dkt. 10, at 9 (Jan. 6, 2021) (setting amendment deadline for 150 days later, which fell on Saturday, June 5, 2021). Because Plaintiff's Motion to Amend was not filed until November 26, 2021, the Court must determine whether to permit amendment under the good cause standard of Rule 16 of the Federal Rules of Civil Procedure, not the more lenient standard of Rule 15.

Rule 16(b)(4) allows amendment after a deadline in a scheduling order only if the moving party establishes "good cause." The good cause standard "primarily considers the diligence of the party seeking the amendment":

> [A] district court may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension. Moreover, carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief. Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification. If that party was not diligent, the inquiry should end.

*Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604, 609 (9th Cir. 1992) (internal quotation marks and citations omitted).

Plaintiff offers only one reason for his failure to seek amendment before the amendment deadline—he claims that Defendant "failed to provide discovery" until several months after the discovery deadline. *Mot. to Amend* at 2. Plaintiff states he did not receive any "discovery" until August 23, 2021. Because Plaintiff did not request any discovery from Defendant, it appears Plaintiff is claiming that he did not receive Defendant's initial disclosures required by the Court's Disclosure and Discovery Order, *see* Dkt. 11, until August 23, 2021.

The Court is not persuaded. August 23, 2021 would have been the date Plaintiff received Defendant's Motion for Summary Judgment and supporting evidence—*not* the date he received Defendant's initial disclosures. *See* Dkt. 20 (e-filed and mailed to Plaintiff on August 20, 2021). Plaintiff appears to confuse the evidence in support of Defendant's Motion for Summary Judgment with the mandatory disclosures that were to be exchanged by April 5, 2021. *Opp. to Mot. to Amend*, Dkt. 38, at 4–6; *see Disclosure and Discovery Order*, Dkt. 11, at 4 (Jan. 6, 2021) (setting mandatory disclosure deadline for 60 days after Defendant filed an answer, which Defendant did on Feb. 4, 2021).

In fact, on April 5, 2021, Defendant did attempt to serve Plaintiff, by mail, with its initial disclosures. *Aff. of Elizabeth Bennett*, Dkt. 38-1, ¶¶ 2, 4. Defendant

MEMORANDUM DECISION AND ORDER - 4

used the address Plaintiff had provided to the Court, which included Plaintiff's inmate number but *not* the number of his housing unit. *Id.* Defendant received the disclosures back, as returned mail, with the notation, "Not Deliverable." *Id.* ¶ 3. Defendant investigated the matter and learned from the IDOC that mail sent to inmates is supposed to include in the address the inmate's housing unit number. Because the April 5 mailing did not contain that number, the mail was returned to Defendant as undeliverable.[1] *Id.* ¶ 5. IDOC staff told Defendant that Plaintiff was housed in Unit 12.

On April 7, 2021—just two days after the initial, failed attempt at service on April 5—Defendant re-mailed its mandatory disclosures to Plaintiff at his now-completed address, which included the housing unit number. *Id.; see also* Dkt. 38-1 (Defendant's mail log). That mailing was not returned to Defendant as undeliverable.

Under the law, the Court presumes that the second mailing arrived at the address to which it was directed and, thus, that Plaintiff received this second

---

[1] Plaintiff contends that it was not an incomplete address that resulted in the April 5 mailing being returned to Defendant, but instead that it was an error in Plaintiff's inmate number—an error purportedly attributable to Defendant. *See* Dkt. 35 at 1. However, Plaintiff offers no support for this contention, and he does not explain how he can possibly know what inmate number was included on a mailing that Plaintiff never received (as it was returned to Defendant). Although an incorrect inmate number was included in one of the affidavits offered in support of Defendant's Motion for Summary Judgment, *see* Dkt. 20-2 at 2, ¶ 2; Dkt. 38-2 at 2 n.2, there is no evidence that the April 5, 2021 mailing of Defendant's mandatory disclosures contained an incorrect inmate number.

mailing of Defendant's mandatory disclosures.[2] *See Schutz v. Jordan*, 141 U.S. 213, 219–20 (1891) ("[I]f a letter properly directed is proved to have been either put into the post-office or delivered to the postman, it is presumed, from the known course of business in the post-office department, that it reached its destination at the regular time, and was received by the person to whom it was addressed.") (internal quotation marks omitted). Plaintiff has not rebutted this presumption of delivery.

Plaintiff does not dispute that he received Defendant's initial disclosures after they were re-mailed to Plaintiff's complete address, including his housing unit, on April 7, 2021.[3] Included in those disclosures are most of the exhibits to the affidavits offered in support of Defendant's Motion for Summary Judgment. *Compare Ex. to Aff. of Jennifer Brizee*, Dkt. 20-2, *with* the following: (1) *Ex. A to Aff. of Sherry Stoutin*, Dkt 20-3; (2) *Ex. A–B to Aff. of Courtney Rossi*, Dkt. 20-4; (3) *Ex. A–B to Aff. of Lora Roberts*, Dkt. 20-5; (4) *Ex. A–O to Aff. of Lyndsey Benedict*, Dkt. 20-6; (5) *Ex. A–B to Aff. of Samantha Harris*, Dkt. 20-7; and (6) *Ex. A–B to Aff. of Thomas Burbie*, Dkt. 20-8. The affiants' identities—from which Plaintiff could have determined whom to add as new defendants—and the subject

---

[2] Assuming that it took a week or less for the second mailing to reach its destination, the Court concludes that Plaintiff must have received the disclosures before or around April 14, 2021.

[3] Notably, though Plaintiff alleges that "no legal mail arrived *on April 5, 2021 or before that*," *see* Dkt. 35 at 2 (emphasis added), he does *not* claim he did not receive the second mailing, sent only two days later.

of their knowledge were also included in those disclosures. *Ex. to Aff. of Jennifer Brizee*, Dkt. 20-2, at 1–13. (Plaintiff was not entitled to the affidavits *themselves* until Defendant filed its Motion for Summary Judgment.)

Further, when Defendant supplemented its initial disclosures, on July 8, 2021, they provided additional medical records from Whitewater Oral Surgery ("Whitewater") and St. Alphonsus—the rest of exhibits offered in support of Defendant's Motion for Summary Judgment. *See Attachment to Sur-reply*, Dkt. 40-1. Even though this disclosure occurred after the amendment deadline, Plaintiff still waited over four months before filing his Motion to Amend. Plaintiff has offered no excuse for this delay.

Accordingly, the Court does not find good cause to permit amendment at this late stage of the proceedings. As of mid-April 2021, Plaintiff had, in his possession, all the information necessary to include any new jail officials or Ivy Medical personnel in an amended complaint. He obtained, in mid-July 2021, additional medical records regarding his treatment by Whitewater physicians and staff at St. Alphonsus. Yet he did not file his Motion to Amend—which does not even include a proposed amended complaint—until late November 2021. This delay, which evidences a lack of diligence, weighs against a finding of good cause.

Defendant's two-day delay in serving Plaintiff with initial disclosures does not justify a finding of good cause for the delay in seeking leave to amend. Two

MEMORANDUM DECISION AND ORDER - 7

days is of little significance when compared to the over seven months that passed

between Plaintiff's receipt of Defendant's disclosures and the filing of Plaintiff's

Motion to Amend. Plaintiff received the initial disclosures, with the identities of

other potential defendants, in mid-April at the latest. He simply was not diligent in

attempting to meet the Court's amendment deadline.

The Court will deny the Motion to Amend because Plaintiff did not submit a

proposed amended complaint and, in any event, has not shown good cause for his

delay in filing the Motion. *See* Fed. R. Civ. P. 16(b)(4).

## 2.      Plaintiff's Motion to Strike Discovery

Plaintiff asks that the Court strike "all defendants [sic] provided discovery,"

by which he seems to mean the evidence submitted in support of Defendant's

Motion for Summary Judgment. *See* Dkt. 35 at 1. The only basis for this request is

that Plaintiff did not receive any legal mail, and thus no discovery or disclosures,

on or before April 5, 2021. *Id*. at 1–2.

As explained above, however, Defendant re-mailed its initial disclosures on

April 7, 2019, because the initial mailing was returned as undeliverable for lack of

a housing unit number. This two-day delay is insufficient to support striking

Defendant's evidence in support of its Motion for Summary Judgment, particularly

given that the delay was caused by Plaintiff's failure to include his housing unit

number in the address he provided to the Court and Defendant. Defendant also

supplemental those disclosures as required as it obtained additional records from third parties. Therefore, Plaintiff's Motion to Strike Discovery will be denied.

**3.     Defendant's Motion to Strike Plaintiff's Statement of Disputed Facts**

Defendant asserts that Plaintiff's Statement of Disputed Facts, which he submitted in opposition to Defendant's Motion for Summary Judgment, was untimely filed and should, therefore, be stricken. The Court is not persuaded.

Because Plaintiff is incarcerated, he is entitled to the benefit of the prison mailbox rule. That rule provides that a legal document is deemed filed on the date a prisoner delivers it to the prison authorities for filing by mail, rather than the date the clerk of court receives the document. *See Houston v. Lack*, 487 U.S. 266, 270–71 (1988); *Douglas v. Noelle*, 567 F.3d 1103, 1107 (9th Cir. 2009) (applying the mailbox rule to civil rights actions). Here, Plaintiff signed (and presumably delivered to prison authorities for mailing) his Statement of Disputed Facts on November 9, 2021, which was the last day to do so. *See* Dkt. 30 (Oct. 26, 2021) (providing a final extension of time for response at 14 days later). Therefore, the statement was timely filed, and the Court will deny Defendant's Motion to Strike that statement.

**4.     Defendant's Motion to Strike Plaintiff's Sur-Reply**

After Defendant filed its Reply in Support of its Motion for Summary Judgment, Plaintiff filed a document entitled, "Plaintiff's Reply to Defendants [sic]

Reply in Support of Motion for Summary Judgment." *See* Dkt. 40. Filing a reply to a reply—often referred to as a "sur-reply,"—is not permitted absent leave of Court. *See* D. Idaho Loc. Civ. R. 7.1. Mindful of Plaintiff's pro se status, however, the Court will deny the Motion to Strike. The Court has considered the information in the sur-reply and concludes that it does not change the Court's analysis, which is set forth below.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons that follow, the Court concludes that Defendant is entitled to summary judgment.

### 1.    Standards of Law Governing Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

In considering a motion for summary judgment, the Court must consider the facts in the light most favorable to the non-moving party, unless the non-moving party's version of those facts is "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). The party moving for summary judgment has the initial burden to show that each material fact cannot be disputed. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, the moving party may cite to particular parts of materials in the record or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact.

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

That is, "if a defendant moving for summary judgment has produced enough evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must counter by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004). If the plaintiff fails to produce evidence, or if the evidence produced is insufficient, the Court "is not

required (or even allowed) to assume the truth of the challenged allegations in the complaint." *Id.*

Affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). In determining admissibility for summary judgment purposes, it is the content of the evidence, rather than its form, that must be considered. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Where, as here, the party moving for summary judgment would not bear the burden of proof at trial, that party may prevail simply by "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

The Court does not determine the credibility of affiants or weigh the evidence set forth by the non-moving party. Direct testimony of the non-moving party must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152,

MEMORANDUM DECISION AND ORDER - 13

1159 (9th Cir. 1999). However, though all reasonable inferences that can be drawn

from the evidence must be drawn in the light most favorable to the non-moving

party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31, the Court is not required to adopt

unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849

F.2d 1205, 1208 (9th Cir. 1988).

　　　　Statements in a brief, unsupported by the record, cannot be used to create an

issue of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir.

1995). The Ninth Circuit "ha[s] repeatedly held that documents which have not had

a proper foundation laid to authenticate them cannot support a motion for summary

judgment." *Beyene v. Coleman Sec. Services, Inc.,* 854 F.2d 1179, 1182 (9th Cir.

1988) (internal quotation marks omitted). Authentication, required by Federal Rule

of Evidence 901(a), is not satisfied simply by attaching a document to an affidavit.

*Id.* The affidavit must contain "testimony of a witness with personal knowledge of

the facts who attests to the identity and due execution of the document." *Id.*

　　　　Pro se inmates are exempted "from *strict* compliance with the summary

judgment rules," but not "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865,

872 (9th Cir. 2018). In opposing a motion for summary judgment, a pro se inmate

must submit at least "some competent evidence," such as a "declaration, affidavit,

[or] authenticated document," to support his allegations or to dispute the moving

party's allegations. *Id.* at 873 (upholding grant of summary judgment against pro

se inmate because the "only statements supporting [plaintiff's] ... argument are in his unsworn district court responses to the defendants' motion for summary judgment and to the district court's show-cause order").

## 2.    Undisputed Facts

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not blatantly contradicted by clear documentary evidence in the record. *See Scott*, 550 U.S. at 380.

Prior to his incarceration, on July 31, 2019, Plaintiff presented to the Emergency Department in Jerome, Idaho, where he was diagnosed with a fracture of his left mandible. *Ex. A to Stoutin Aff.*, Ivy Medical 000160. He was scheduled to have surgery the next day, but he did not secure a ride home; the surgery was not performed, and the oral surgeon discontinued seeing Plaintiff as a patient. *Id.* He returned to the Emergency Department on August 6, 2019, requesting help finding another oral surgeon. The doctor on call agreed to "refilling his pain medications for a short amount of time." *Id.*, Ivy Medical 000163. Plaintiff was referred to a surgeon in Boise and discharged with a prescription of Norco and orders to continue Keflex, an antibiotic, for ten days, to end August 10, 2019. *Id.*, Ivy Medical 000162–64.

MEMORANDUM DECISION AND ORDER - 15

On August 8, 2019, Dr. Kempers, from Whitewater Oral Surgery, performed the surgery at St. Luke's hospital in Boise, Idaho. *Id.*, Ivy Medical 000169–70.

Dr. Kempers prescribed Plaintiff ten days of post-surgery antibiotics (to end August 18) and chlorhexidine mouthwash. A follow-up appointment was scheduled for August 23, 2019. *Id.*, Ivy Medical 000006. However, because Plaintiff was booked into the Twin Falls County Jail on August 22, he did not attend his scheduled follow-up appointment with Dr. Kempers. *See Roberts Aff.*, ¶ 2 *and Ex. A*, Ivy Medical 000010 ("no post op FU as [Plaintiff] was arrested").

Defendant Ivy Medical is the private entity providing jail inmates with medical treatment under contract with Twin Falls County.[4] The owner and medical director of Ivy Medical is Dr. Sherry Stoutin. *See Stoutin Aff.*, ¶ 1.

On Friday, August 23, 2019, the day after Plaintiff arrived at the Twin Falls County Jail, Ivy Medical Administrator Courtney Rossi sent a fax to Whitewater, asking for Plaintiff's complete medical records. *Ex. A to Stoutin Aff.*, Ivy Medical 000173. That same day, Whitewater faxed back the post-operative instructions from Plaintiff's oral surgeon. *Id.*, Ivy Medical 000175. The fax did not include

---

[4] As such, Ivy Medical is considered a state actor subject to suit under 42 U.S.C. § 1983. *See West v. Atkins*, 487 U.S. 42, 54 (1988).

Plaintiff's discharge instructions from St. Luke's, the hospital where the surgery was performed. *See id.*, Ivy Medical 000172, 177; *Burbie Aff.*, ¶ 2.

Also on August 23, 2019, Plaintiff was evaluated by Licensed Practical Nurse Lyndsey Benedict, a member of Defendant's medical staff. Plaintiff told Benedict that he had a broken jaw and was taking the opioid Percocet for pain. *Ex. A. to Stoutin Aff.*, Ivy Medical 000001–2. However, the post-operative instructions faxed to the jail by Whitewater did not indicate that Plaintiff had been prescribed pain medication. *Id.*, Ivy Medical 000011–12, 175.

Benedict determined, based on "policy and safety considerations," that ibuprofen would be sufficient to treat Plaintiff's pain over the weekend and that opioid withdrawal protocol was not medically necessary. *Benedict Aff.*, ¶ 2. Although Benedict does not identify the particular "policy" to which she refers, it is likely the general pain-management practice described by Dr. Stoutin in her affidavit. According to Dr. Stoutin, it "is common practice to not prescribe or distribute narcotic pain medications, including Percoset and Tramadol, to inmates absent an acute injury or an immediate post-surgical need." *Stoutin Aff.*, ¶ 6. Benedict's reference to "safety considerations" may refer to the potential danger of addiction posed by opioid use.

In addition to approving ibuprofen for pain,[5] Benedict approved a soft diet. Plaintiff acknowledges that he received one 200 mg dose of ibuprofen after this appointment with LPN Benedict and does not dispute that he received a soft food diet. *See Aff. of Joseph Baxter*, Dkt. 32-2, ¶ 19.

Plaintiff does assert that he received *only* the one dose of ibuprofen, and no other "appropriate" pain medication, before September 21, 2019. *Id*.; *Stmt. of Disp. Facts*, Dkt. 32, at 4 ("Ivy Medical only aproved [sic] ibuprofen for one day the 24th of August 2019."). By this allegation, it appears that Plaintiff is claiming he was given only one dose of ibuprofen free-of-charge on August 23 or 24, 2019—not that he was *prohibited* from taking ibuprofen before September 21—as inmates can purchase ibuprofen, and other over-the-counter ("OTC") medication, from the jail commissary. *See Stoutin Aff*., ¶ 6. The record reflects no evidence that Plaintiff was indigent and unable to purchase OTC medications, or, if he was, that he communicated this information to medical staff when he was held in the Twin Falls County Jail.

On August 24, 2019, Plaintiff asked to be seen by medical and dental staff. Medical personnel responded that Plaintiff had just been evaluated by medical staff the day before. The response also stated that the dental department "does not deal

---

[5] Because ibuprofen is a non-prescription pain reliever that inmates can purchase from the jail commissary, *see Stoutin Aff*., ¶ 6, it appears that when an Ivy Medical staff member "approves" ibuprofen for an inmate patient, it means that the patient is given the ibuprofen for free, rather than having to purchase it at the commissary.

with this issue," presumably because dentistry and oral surgery are different disciplines. *Ex. A to Stoutin Aff.*, Ivy Medical 000003.

On August 30, Plaintiff requested another appointment for his jaw. In response, medical staff asked which doctor Plaintiff was seeing and stated, "Please let me know so I can order the records and talk to my provider and see if an appointment can be set up. Thanks." *Id.*, Ivy Medical 000005. Plaintiff disputes that medical staff needed to ask him about his doctor, and contends he did not have to respond to this inquiry, because Ivy Medical already had his medical records and, thus, should have known who the doctor was. *Stmt. of Disp. Facts* at 3.

On August 31, 2019, Registered Nurse Thomas Burbie evaluated Plaintiff's jaw. Plaintiff said that he thought his jaw might be infected. *Ex. A to Stoutin Aff.*, Ivy Medical 000007–8. Plaintiff said that he should be on antibiotics, pain medication, and "an oral swish solution." *Burbie Aff.*, ¶ 2. Nurse Burbie conferred with a nurse practitioner about Plaintiff's medical issues and scheduled a visit for Plaintiff to be seen by the NP "at the next available date." *Id.* Burbie himself did not give Plaintiff any pain medication because there was no prescription for pain medication in the medical records faxed by Whitewater and also, presumably, because RNs are not licensed to prescribe medication. *Id.*

Nurse Burbie also noted that Whitewater had not provided Plaintiff's discharge instructions and sent another fax requesting them. *Id.* Whitewater

responded on September 3, 2019, stating that such instructions would need to be retrieved from St. Luke's Health System because the surgery was performed there. *Ex. A to Stoutin Aff.*, Ivy Medical 000176. It is unclear when Ivy Medical received medical records from St. Luke's.

Plaintiff requested pain medication on September 2. NP Lora Roberts examined Plaintiff the next day, on September 3, 2019. *Id.*, Ivy Medical 000009–10. Plaintiff and NP Roberts describe this appointment differently.

NP Roberts declares that Plaintiff told her he had only taken three of his previously prescribed antibiotic pills, a medication called clindamycin, even though he was supposed to have taken them for ten full days after surgery—which would have been through August 18, 2019. *Roberts Aff.*, ¶ 2. Roberts also claims that Plaintiff said he had been using methamphetamine before his arrest, instead of his prescribed pain medication and mouthwash, because "meth is better than meds and fixes everything." *Id. and Ex A.*, Ivy Medical 000010. Roberts re-prescribed the chlorhexidine mouthwash and instructed Plaintiff on how to use it. Roberts also re-prescribed the antibiotic clindamycin to be used per the surgeon's post-operative instructions. *Id.* Roberts did not prescribe pain medication and noted that Plaintiff did not require emergent care. *Roberts Aff.*, ¶ 3.

According to Plaintiff, he did not tell NP Roberts he had taken only three clindamycin pills; rather, he told Roberts he had taken all *but* three of them. *Baxter*

*Aff.* at ¶ 31. This difference between Plaintiff's and Roberts's recollections could have been a simple misunderstanding of Plaintiff's statements at the appointment. In any event, regardless of the precise number of doses Plaintiff appropriately took, it is clear that before his arrest, Plaintiff had not taken all of his antibiotics as prescribed by Dr. Kempers—Plaintiff's antibiotics should all have been taken by August 18, 2019, ten days after the surgery, and Plaintiff was not arrested until August 22. Thus, Plaintiff had not been compliant with his post-operative instructions.

Plaintiff also acknowledges that he informed Roberts of his pre-arrest methamphetamine use, but he denies saying that meth fixes everything or that meth worked better than his prescribed medication. *Baxter Aff.* at ¶ 31. Though Plaintiff claims that he did not *receive* any antibiotic medication or chlorhexidine mouthwash until September 25, 2019, *see Stmt. of Disp. Facts* at 6, the medical records clearly show that these medications were, in fact, prescribed by NP Roberts on September 3, *see Ex A. to Roberts Aff.*, Ivy Medical 000010. The record does not indicate why Plaintiff might not have actually received the medication he was prescribed.

After business hours on September 3, Plaintiff submitted a request for pain medication. Medical staff responded the next morning, explaining that Dr. Kempers had not prescribed pain medication and that Plaintiff could obtain OTC

pain medication from the commissary. Later that day, Plaintiff again asked for pain medication and was again told that no provider had prescribed it. *Ex. A to Stoutin Aff.*, Ivy Medical 000011–12. However, the responding staff member offered to have Plaintiff evaluated once again by the nurse practitioner—whom Plaintiff had seen just the day before.

On September 5, 2019, Plaintiff again requested pain medication and asked for a follow-up appointment with his oral surgeon. Plaintiff was informed that medical staff were in the process of "trying to get [him] seen for a post op visit" and that, as he had already been informed, he could purchase pain medication from the commissary. *Id.*, Ivy Medical 000013.

Also on September 5, LPN Benedict again evaluated Plaintiff. Benedict noted that Plaintiff "was only swishing [the chlorhexidine mouthwash] for a few seconds then spitting." *Id.*, Ivy Medical 000014. Benedict advised Plaintiff that "he needs to swish for at least 20-30 seconds before spitting." *Id.* Benedict also told Plaintiff that it was difficult to schedule a follow-up because Plaintiff was in Twin Falls and the surgery had been performed in Boise. *Id.*; *see also Benedict Aff.*, ¶ 3.

Plaintiff complained again about his medical treatment on September 8, 2019. Medical staff responded the next day: "We are still trying to get someone to look at you post-op; it has been a challenge as you did not have your surgery in Twin Falls. Please be patient as we try to get something arranged for you." *Ex. A to*

*Stoutin Aff.*, Ivy Medical 000015. By this time, Plaintiff had been in custody for just over two weeks.

Administrator Rossi testifies that she made numerous calls trying to schedule Plaintiff for a surgical follow-up appointment. Rossi remembers that, as early as August and before September 11, 2019, she contacted at least two oral surgeons who practiced locally in Twin Falls: Dr. Hopkins and Dr. Plant. Dr. Plant responded that he was not accepting any new patients, and Dr. Hopkins refused to take Plaintiff as a patient because of Plaintiff's documented "methamphetamine use and because he had arrived for a prior surgery without anyone to drive him home." *Rossi Aff.*, ¶ 3.

Plaintiff disputes Rossi's testimony about these early attempts to find an oral surgeon. He contends that the first time any oral surgeon was contacted about examining Plaintiff was September 12, 2019; for this allegation, Plaintiff relies on an affidavit submitted by Dr. Stoutin in a state court case. *Stmt. of Disp. Facts* at 7. However, the state court affidavit does not state that *no* attempts were made to contact oral surgeons before September 12—it merely lists the first *specified* date of such attempted contacts as September 12, 2019. *see also Ex. A to Stoutin Aff.*, Ivy Medical 000218–19, ¶ 5(a). The affidavit discusses Dr. Hopkins's refusal to accept Plaintiff as a patient but does not identify the particular date when the discussion occurred. Therefore, Dr. Stoutin's state court affidavit is not

MEMORANDUM DECISION AND ORDER - 23

inconsistent with Rossi's testimony about what Rossi remembers doing. It does not give rise to a genuine dispute as to Rossi's attempts to find Plaintiff an oral surgeon in late August or early September.

Additionally, the record contains an email from LPN Benedict to Dr. Stoutin, dated September 11, 2019, in which Benedict details the efforts she had already undergone, before September 11, to try to find an oral surgeon who would see Plaintiff:

> [Plaintiff] … did not make it to his follow-up
> appointment as he was incarcerated at the time... I have
> been trying to call around and see if ANYONE will see
> this man for f/u; nobody here in Twin will see him as
> they did not do the surgery.

*Benedict Aff.*, ¶ 6 *and Ex. E*, Ivy Medical 000213.

On September 11, LPN Benedict also contacted the Boise-based Whitewater group and asked for help in finding a surgeon near Twin Falls. Benedict told the Whitewater receptionist that, per Benedict's understanding of jail policy, "there was no way to transport Plaintiff to Boise for a follow-up appointment" because Twin Falls County deputies "do not do transports for medical appointments outside of the county." *Benedict Aff.*, ¶ 4 *and Ex. C & D*, Ivy Medical 000017–19. Doctors at Whitewater would not refer Plaintiff to a local provider but did offer to evaluate Plaintiff after his release from jail. *Id.*

According to Plaintiff, there was no jail policy prohibiting out-of-county transports for medical appointments; he alleges that numerous inmates were taken out of Twin Falls County for such purposes. *Stmt. of Disp. Facts* at 8. The Court accepts Plaintiff's version for purposes of summary judgment—that the Twin Falls County Jail did *not* have a policy or practice of not taking inmates to out-of-county medical appointments. Though Plaintiff contends that LPN Benedict "knew" there was no such transportation policy, he offers no basis for this contention. Benedict (who worked for Ivy Medical) might simply have been operating under a misunderstanding or misassumption as to whether jail deputies (who worked for Twin Falls County) would transport inmates across county lines for medical appointments. In fact, Benedict states jail deputies informed her that they do not transport inmates out-of-county for medical purposes. *Benedict Aff.*, ¶ 5.

On September 12, 2019, after Plaintiff submitted another request for pain medication, LPN Benedict approved ibuprofen for one week, provided to Plaintiff free-of-charge. Plaintiff claims again, however, that he did not receive the ibuprofen, and the record is not clear as to the reason why. *Stmt. of Disp. Facts* at 11. Benedict informed Plaintiff that he would need to get any additional ibuprofen from the commissary and that medical staff were still trying to find a provider who would see Plaintiff for a post-surgical follow-up appointment. *Benedict Aff.*, ¶ 7 *and Ex. F*, Ivy Medical 000020. Benedict also tried to contact two other providers

MEMORANDUM DECISION AND ORDER - 25

for a follow-up appointment—an ear, nose, and throat doctor and a dentist. The ENT doctor declined to see Plaintiff, and the dentist did not return Benedict's call.[6] *Benedict Aff.*, ¶ 8.

There are no records that Plaintiff requested pain medication or other medical treatment from September 12 to September 24.[7] A medical staff member did, however, set up an appointment for Plaintiff to see the jail dentist. Though the dentist would have been unable to provide care for Plaintiff's jaw issue, medical staff hoped the dentist could perhaps refer Plaintiff to an oral surgeon, who might take such a referral from a local dental provider. *Ex. A to Stoutin Aff.*, Ivy Medical 000023–24.

On September 24, 2019, Plaintiff asked why he would be seeing the jail dentist instead of an oral surgeon. In response, medical staff told Plaintiff that Dr. Kempers would not refer to him to a Twin Falls provider and that the dentist could check Plaintiff for infection and could refer Plaintiff to a local oral surgeon. Plaintiff was asked if he was refusing to see the dentist; several days later, Plaintiff responded that he was not refusing and that he still wanted to see the dentist. *Id.*, Ivy Medical 000024–25.

---

[6] Approximately two weeks later, on September 27, Benedict again tried to contact the Twin Falls dentist. It appears Benedict was unsuccessful. *Benedict Aff.*, ¶ 9.

[7] Plaintiff states that the fact that he did not request care in this time frame "is in dispute," but he does not provide any details as to what he requested or when. *Stmt. of Disp. Facts* at 10. Therefore, the Court concludes this is not a genuine factual dispute.

The jail dentist saw Plaintiff on October 3, 2019. Plaintiff told the dentist that he had wires in his jaw that were supposed to be removed but were not. The dentist saw some signs of infection and noted, "[W]ill try to fight infection with antibiotics." *Ex. A to Stoutin Aff.*, Ivy Medical 000181. However, the record does not show that the dentist actually ordered or recommended antibiotics. *Id*. The dentist did not refer Plaintiff to an oral surgeon.

Plaintiff was informed on October 7, 2019, that his follow-up appointment had been scheduled. The appointment was for Plaintiff to see an oral surgeon at Whitewater on October 28. Plaintiff was not told the date of the appointment, however, because jail security policy does not permit such information to be provided to inmates. It is unclear which medical staff member made the appointment with Whitewater on Plaintiff's behalf. *Id*., Ivy Medical 000028.

Plaintiff complained about his medical treatment on October 17, 2019. Plaintiff was again informed that the surgical follow-up appointment was scheduled but that medical staff could not share this information with Plaintiff. *Id*., Ivy Medical 000029.

Plaintiff asked for pain medication on October 20, 2019. NP Roberts approved 1000 mg Tylenol and 800 mg ibuprofen for pain, to be taken twice per day, until Plaintiff's follow-up appointment. *Id*., Ivy Medical 000030–31; *Harris*

*Aff.*, ¶ 2. Nurse Harris related this to Plaintiff and reminded him that he would be seeing the oral surgeon soon.

On October 28, 2019, Plaintiff was transported to Whitewater's office in Hailey, Idaho, for his follow-up appointment. Oral surgeon Dr. Hastings evaluated Plaintiff and determined that he would need another jaw surgery because Plaintiff's jaw bones had not healed properly. *Benedict Aff.*, ¶ 11. The doctor informed LPN Benedict of the need for additional surgery and told her Plaintiff would have to be transported to Boise for the outpatient surgery, which would take place at St. Alphonsus Hospital. *Ex. A to Stoutin Aff.*, Ivy Medical 000032–33, 180, 182, 214; *Benedict Aff.*, ¶ 11. The surgery was scheduled for November 6, 2019, but Plaintiff was not informed of the date for security purposes. *Roberts Aff.*, ¶ 4 *and Ex. B*, Ivy Medical 000042.

On October 29, 2019, Plaintiff requested a specific medication: Norco. *Ex. A to Stoutin Aff.*, Ivy Medical 000034. Norco contains acetaminophen and hydrocodone, which is a narcotic. Plaintiff received the following responses, though it is not clear which medical staff member responded:

> We cannot approve anything but tylenol or ibuprofen for you while incarcerated as it is against our policy and a safety risk for you. I will approve both tylenol and ibuprofen for the next week. If you want it further you will either need to have it approved longer term by the NP or buy it out of commissary.
>
> …

> The Dr. you saw yesterday did not prescribe anything for
> pain for you at this time. We have approved ibuprofen
> and Tylenol for one week.

*Id.*, Ivy Medical 000035–36. Though it is not entirely clear, the explanation that

Norco would not be prescribed because it was a "safety risk for Plaintiff" is

consistent with the facts in the record showing that Plaintiff had a recent history of

substance abuse (methamphetamine), which increases the risk of addiction from

opioid use.

This understanding of Ivy Medical's "policy" of prescribing only Tylenol or

ibuprofen for pain management, as communicated to Plaintiff, is different from the

way Dr. Stoutin describes Ivy Medical's common practice. There is no evidence in

the record that jail staff regularly withheld all narcotic pain medication in all

circumstances, including for "an acute injury or an immediate post-surgical need,"

such that the Court could deem this staff member's description as a custom or

policy of not prescribing narcotics. For example, Plaintiff did not produce evidence

that jail medical staff never provided narcotic pain medication to inmates for any

reason—something he could have obtained through discovery if any such evidence

existed.

As stated earlier, Dr. Stoutin testifies to a "common practice to not prescribe

or distribute narcotic pain medications … to inmates absent an acute injury or an

immediate post-surgical need"; Dr. Stoutin also states that when narcotics *are*

MEMORANDUM DECISION AND ORDER - 29

provided to inmates, it is typically only for three to five days. *Stoutin Aff.*, ¶ 6. As for OTC pain medications like Tylenol and ibuprofen, "typically an inmate is responsible to purchase such medications from the jail commissary." *Id*.

The way the medical staff member described the pain-medication policy to Plaintiff on October 29, 2019, is inaccurate: under a policy like the one described to Plaintiff, providers would have no discretion to prescribe narcotics. Dr. Stoutin's uncontroverted testimony, as well as the evidence that Plaintiff was, indeed, prescribed tramadol just over a week later, shows that Defendant's narcotic pain medication policy is discretionary and within the individual medical provider's professional judgment.

Plaintiff's second jaw surgery took place on November 6, 2019. The oral surgeon, Dr. Hastings, implanted a metal plate into Plaintiff's jaw. *Ex. A to Stoutin Aff.*, Ivy Medical 000185. Dr. Hastings did not prescribe any pain medication for Plaintiff. Instead, he recommended only that Plaintiff take acetaminophen (Tylenol) or ibuprofen.[8] *Id.*, Ivy Medical 000186–95. Nonetheless, LPN Benedict contacted NP Roberts to discuss prescription pain medication for Plaintiff. *Benedict Aff.*, ¶ 12. As a result, NP Roberts prescribed the opioid tramadol for Plaintiff upon his return to the jail. *Roberts Aff.*, ¶ 5. Plaintiff received 50 mg of tramadol as an immediate first dose, and another 50 mg when he continued to

---

[8] Dr. Hastings also prescribed the antibiotic clindamycin. *Ex. A to Stoutin Aff.*, Ivy Medical 000209.

complain of pain after an hour. Roberts also ordered 100 mg of tramadol for Plaintiff to take the next morning. *Id.*; *Benedict Aff.* ¶ 12 *and Ex. J*, Ivy Medical 000044–46.

At 9:30 p.m. on November 6, LPN Benedict was called to the medical unit because of a use-of-force incident involving Plaintiff. Plaintiff expressed unhappiness with his liquid diet—which Benedict reminded him had been dictated by Plaintiff's surgeon—and complained of pain. *Benedict Aff.*, ¶ 13. Benedict explained that she "had gone out of [her] way to have Tramadol approved for him by the nurse practitioner, as the Boise oral surgeon did not send orders for pain medication other than Tylenol or ibuprofen." *Id. and Ex. K*, Ivy Medical 000047.

Deputies called LPN Benedict again at 11:00 p.m. that same evening and reported that Plaintiff "was demanding to see medical, that he was demanding to go to the ER, and that he was complaining of his stitches falling out." *Id.*, ¶ 14. Plaintiff had already had two doses of tramadol and ibuprofen, so Benedict approved "two Tylenol as needed and ice for the jaw pain, as ordered by Plaintiff's surgeon." *Id. and Ex. L*, Ivy Medical 000048.

On November 7, Plaintiff asked for more pain medication. Benedict explained to Plaintiff that, although Plaintiff's surgeon had prescribed only Tylenol and ibuprofen, Benedict would look into the possibility of additional pain medication. *Id.* ¶ 15 *and Ex. M*, Ivy Medical 000049–50.

In an email to Dr. Stoutin, LPN Benedict expressed her frustration with

Plaintiff's interactions with medical staff:

> Sherry, also just so you are aware, [Plaintiff] started
> being rude to deputies and medical staff here at the jail
> after surgery yesterday … and deputies had to go hands
> on as he was covering his camera and not obeying deputy
> commands. I've documented all of this in his nurse's
> notes, and Lora [Roberts] is aware. *I feel I should not try
> to contact his surgeon for further pain medication either,
> because I went out of my way to get him a tramadol
> order for pain control from Lora and he acted this way*.
> Not sure if you'd like me to do anything further for him
> or not, please let me know if so.

*Ex. A to Stoutin Aff.*, Ivy Medical 000215 (emphasis added).

Notwithstanding Benedict's frustration, that same day Benedict did, in fact,

contact Dr. Hastings, who had performed Plaintiff's second surgery. Dr. Hastings

prescribed 50 mg of tramadol twice daily and 800 mg ibuprofen "as needed for

breakthrough pain" until Plaintiff could be seen for his follow-up appointment. *Ex.

M to Benedict Aff.*, Ivy Medical 000049–50. Benedict reported this to Dr. Stoutin

in another email: "I did contact the surgeon and get pain management orders, just

to clarify that. Just had to rant a little!" *Ex. A to Stoutin Aff.*, Ivy Medical 000215

(emphasis added).

Plaintiff's follow-up appointment at Whitewater was on November 11, 2019,

and the surgeon reported that Plaintiff was "stable post-op." *Ex. A to Stoutin Aff.*,

Ivy Medical 000185. The next day, after Plaintiff said he was still in pain,

Administrator Rossi contacted Dr. Hastings as requested by medical staff. Dr. Hastings re-prescribed tramadol and ibuprofen, to continue until Plaintiff's next appointment on November 21, 2019. *Id.*, Ivy Medical 000054; *Rossi Aff.*, ¶ 4.

Plaintiff did not receive tramadol on the evening of November 21, because Dr. Hastings's order for that medication had expired. Plaintiff complained and was given 1000 mg Tylenol the next day. Plaintiff was then placed back on tramadol "and was told he would continue to receive Tramadol and ibuprofen" as Dr. Hastings had previously ordered. *Ex. A to Stoutin Aff.*, Ivy Medical 000058–61. Dr. Stoutin describes the provision of tramadol as an "extraordinary accommodation to Plaintiff." *Stoutin Aff.*, ¶ 6.

On November 25, 2019, Plaintiff's oral surgeon changed his orders to discontinue tramadol (still allowing for OTC pain medication) and to advance Plaintiff's diet as tolerated. *Benedict Aff.*, ¶ 17 *and Ex. O*, Ivy Medical 0000064–66. When Plaintiff asked why he was no longer receiving tramadol, medical staff informed Plaintiff of the surgeon's orders. *Ex. A to Stoutin Aff.*, Ivy Medical 000067.

## 3.    Discussion

Plaintiff asserts that Defendant violated the Constitution following his first jaw surgery by failing to provide him with adequate medical treatment, which necessitated a second jaw surgery. Plaintiff's claims center on the allegation that

Defendant delayed or denied necessary antibiotics, mouthwash, and pain medication pursuant to a policy or custom of Defendant.

### A.   *Standards of Law Applicable to Plaintiff's Claims of Inadequate Medical Treatment*

#### i.   <u>Policy- or Custom-Based Claims</u>

Defendant is a private entity performing a government function. Therefore, Plaintiff's claim can survive summary judgment if there is a genuine dispute of material fact as to whether the execution of an official policy or unofficial custom of the entity *itself* violated Plaintiff's constitutional rights. *Monell v. Dept. of Soc. Serv. of New York*, 436 U.S. 658, 694 (1978) (discussing § 1983 claims against local government entities); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities performing a government function). Under *Monell*, the requisite elements of a § 1983 claim against an entity like Defendant are the following: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

The challenged policy or custom "may not be proved through reference to a single unconstitutional incident unless proof of the incident includes proof that it was caused by an existing unconstitutional policy." *Rogan v. City of Los Angeles*,

668 F. Supp. 1384, 1395 (C.D. Cal. 1987) (internal quotation marks and alteration omitted). An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Further, a municipality or private entity performing a state function "may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010) (internal quotation marks omitted), *overruled in part on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc). A *Monell* claim may not rest on the mere fact that an entity's employees all acted in a similar way—instead, there must be evidence of a causal connection between that action and a policy or custom of the entity.

Plaintiff asserts his § 1983 claims under the Eighth Amendment, which protects convicted inmates against cruel and unusual punishment. However, it

appears that Plaintiff's claims might be more appropriately analyzed under the Due Process Clause of the Fourteenth Amendment, which applies to pretrial detainees.[9] *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Thus, the Court will analyze Defendant's Motion for Summary Judgment under both sets of standards.

ii.    <u>Eighth Amendment Standard</u>

To succeed on an Eighth Amendment claim, an inmate must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' actions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires the plaintiff to satisfy both (1) an objective standard, "that the deprivation was serious enough to constitute cruel and unusual punishment," and (2) a subjective standard, that the defendant acted with "deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

The Eighth Amendment includes the right to adequate medical treatment in prison. Prison officials or prison medical providers can be held liable if their "acts

---

[9] Though Plaintiff is now a convicted prisoner and, at one point, was held in the Twin Falls County Jail even after his conviction, it appears that he may have been a pretrial detainee at the time his claims arose. *See Am. Compl.*, Dkt. 8, at 5. Ultimately, whether Plaintiff was a pretrial detainee or a convicted inmate at the time of the events giving rise to his civil rights claim is not relevant to the Court's resolution of the pending Motions, because the Court's decision would be the same under either analysis.

or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

Regarding the objective standard for inmates' medical care claims, "society does not expect that prisoners will have unqualified access to health care." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). Therefore, "deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id*. The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] ... [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain ....

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

As to the subjective standard, "deliberate indifference entails something more than mere negligence, [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. A prison official or prison medical provider acts with deliberate indifference "only if the [prison official or provider] knows of and

disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002) (internal quotation marks omitted), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104–05 (footnotes omitted). Medical malpractice or negligence does not support a cause of action under the Eighth Amendment, *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam), and a delay in medical treatment does not violate the Eighth Amendment unless that delay causes further harm, *McGuckin*, 974 F.2d at 1060. Additionally, there is no constitutional right to an outside medical provider of one's own choice. *See Roberts v. Spalding,* 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

"If a [jail official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188. Moreover, even officials or medical providers who *did* know of a substantial risk to an inmate's health will not be liable under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. If medical personnel have been "consistently responsive to [the inmate's] medical needs," and the plaintiff has not shown that the medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," there has been no Eighth Amendment violation. *Toguchi*, 391 F.3d at 1061.

"There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal quotation marks omitted). Accordingly, mere differences in judgment as to appropriate medical diagnosis and treatment between an inmate and prison medical providers—or, for that matter, between medical providers—are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

"[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of

an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration

omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). Stated

another way, a plaintiff must prove that medical providers chose one treatment

over the plaintiff's preferred treatment "even though they knew [the plaintiff's

preferred treatment] to be medically necessary based on [the plaintiff's] records

and prevailing medical standards." *Norsworthy v. Beard*, 87 F. Supp. 3d 1104,

1117 (N.D. Cal. 2015). To violate the Eighth Amendment, the choice of treatment

must have been "so inadequate that it demonstrated an absence of professional

judgment, that is, that no minimally competent professional would have so

responded under those circumstances." *Collignon v. Milwaukee Cnty.*, 163 F.3d

982, 989 (7th Cir. 1998); *see also Lamb v. Norwood*, 895 F.3d 756, 760 (10th Cir.

2018) ("[P]rison officials do not act with deliberate indifference when they provide

medical treatment even if it is subpar or different from what the inmate wants.").

A court's review of a prison medical provider's choice of treatment must be

especially deferential where the issue is the type or amount of pain medication an

inmate should receive. In such cases, the court "is asked to pass judgment on the

attempts by prison medical staff to navigate between" the risk of "debilitating

pain" and the competing risk of addiction. *Baker v. Stevenson*, 605 F. App'x 514,

519 (6th Cir. 2015) (unpublished). Where a prison medical provider believes in

good faith that a certain course of pain treatment might "create or enable" a risk of

addiction, the provider's decision not to provide that treatment "cannot be considered an act of deliberate indifference." *Id*. The Constitution "does not impose a constitutional obligation upon prison officials" or medical providers "to enable a prisoner's substance abuse or addiction problem." *Id*. at 518.

The Eighth Amendment requires that medical providers exercise informed medical judgment. Thus, if a medical treatment is denied because of a blanket policy—rather than an individualized determination of the appropriate treatment for the particular inmate—a factfinder may infer deliberate indifference. *See Rosati v. Igbinoso*, 791 F.3d 1037, 1039–40 (9th Cir. 2015) ("Rosati plausibly alleges that prison officials were aware of her medical history and need for treatment, but denied the surgery because of a blanket policy …."); *Allard v. Gomez*, 9 F. App'x 793, 795 (9th Cir. 2001) (unpublished) (triable issues existed as to whether treatment "was denied ... on the basis of an individualized medical evaluation or as a result of a blanket rule."). For example, if a jail or prison medical provider has an across-the-board policy of never prescribing narcotic medication in any circumstance—and the inmate can also show a causal link between that policy and the inmate's injury—that circumstance can amount to deliberate indifference. *See Mabe*, 237 F.3d at 1111.

However, if providers make an individualized assessment and choose a treatment that, in their informed judgment, is medically appropriate, a plaintiff

generally cannot establish deliberate indifference. *See, e.g., Lamb*, 895 F.3d at 760 ("[The plaintiff] is obtaining psychological counseling and hormone treatments, including estrogen and testosterone-blocking medication. Though prison officials have not authorized surgery or the hormone dosages that [the plaintiff] wants, the existing treatment precludes a reasonable fact-finder from inferring deliberate indifference."); *Supre v. Ricketts*, 792 F.2d 958, 963 (10th Cir. 1986) ("While the medical community may disagree among themselves as to the best form of treatment for plaintiff's condition, the Department of Corrections made an informed judgment as to the appropriate form of treatment and did not deliberately ignore plaintiff's medical needs."). In such a case, a plaintiff may avoid summary judgment on an Eighth Amendment claim only if the defendants intentionally interfered with appropriate medical diagnosis and treatment—for example, by "creat[ing] a pretextual report to support denial" of a certain treatment. *Norsworthy*, 87 F. Supp. 3d at 1117.

> iii.   Fourteenth Amendment Standard

Pretrial detainees have a right to adequate medical treatment under the Due Process Clause of the Fourteenth Amendment. *Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010). Jail conditions, including medical treatment for pretrial detainees, violate the Constitution if those conditions amount to punishment. *Bell*, 441 U.S. at 535.

Detainees' claims of inadequate medical treatment are analyzed using a standard of "objective deliberate indifference." *Gordon v. County of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018). Under that standard, a detainee must establish the following elements:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125. The application of this standard "will necessarily turn on the facts and circumstances of each particular case." *Id.* (internal quotation marks and alteration omitted).

The main difference between medical treatment claims under the Due Process Clause and those under the Eighth Amendment is that a pretrial detainee asserting a due process claim need not prove subjective deliberate indifference. *See Castro*, 833 F.3d at 1071 (stating that a pretrial detainee complaining of unconstitutional conditions of confinement must "prove more than negligence but less than subjective intent—something akin to reckless disregard.").[10]

_____

[10] Although courts use an objective standard in evaluating medical-treatment claims of pretrial detainees, this standard must not be confused with the objective standard used for evaluating claims of negligence or medical malpractice under state law. This is because negligence—the "mere lack of due care" by a

**B.    Because There Is No Evidence of a Policy or Custom Amounting to Deliberate Indifference to Plaintiff's Serious Medical Needs, Defendant Is Entitled to Summary Judgment on Plaintiff's Claims**

Plaintiffs' claims can be separated into four alleged policies or customs of Defendant Ivy Medical that purportedly amount to deliberate indifference and caused Plaintiff to receive inadequate medical treatment in violation of the Due Process Clause or the Eighth Amendment. The alleged polices or customs at issue are as follows: (1) delaying or denying access to non-pain-related medication that has already been prescribed (in Plaintiff's case, antibiotics and chlorhexidine mouthwash); (2) delaying or not prescribing medication that is adequate to treat pain; (3) requiring inmates to purchase OTC medication at the commissary, rather than providing it free-of-charge; and (4) relying on a nonexistent jail transportation policy to avoid sending Plaintiff to out-of-county medical providers. For the reasons that follow, the Court will grant Defendant summary judgment on all these policy- or custom-based claims.

i.    <u>The Evidence Does Not Show a Policy or Custom of Delaying or Denying Medication Prescribed for Non-Pain-Related Reasons, such as Plaintiff's Antibiotics and Mouthwash</u>

There are several different periods of time that Plaintiff allegedly went without his prescribed antibiotics and mouthwash. The first is the time period from

---

governmental official—"does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071; *see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (holding that negligence is not actionable under § 1983 because such actions are not an abuse of governmental power, but merely a "failure to measure up to the conduct of a reasonable person").

August 22, when Plaintiff was incarcerated, to September 3, 2019, when NP

Roberts re-prescribed clindamycin (an antibiotic) and chlorohexidine (a special

mouthwash). By that time, Plaintiff had had two courses of antibiotics prescribed

to him (one on August 6 and another on August 8), which should have been

completed by August 18. Plaintiff asserts he took all but three of his antibiotics

prescribed the second time, which was on the tail of the first course, which means

that he would have been on antibiotics for 17 days before his 10-day break caused

by his incarceration and jail medical personnel hunting down his medical records.

To overcome summary judgment, Plaintiff must bring forward evidence

showing that this ten-day delay was caused by a policy or custom of Ivy Medical.

Plaintiff has pointed to nothing in the record demonstrating which policy or custom

caused the delay and why, or that other examples of delay occurred because of this

same policy, such that it was a pattern of delay for other inmates, as well. In

Plaintiff's case, the record shows that medical personnel began requesting his

records immediately and continued to work on finding an oral surgeon to see him

in follow-up. A factfinder could not infer based on this record that any custom or

policy caused the ten-day delay. Having to wait *at least* ten days to see a provider

is frequently the case for medical treatment even outside of prison. It is not

uncommon for weeks to pass before a patient can see a provider, whether they are

in prison or not. In fact, Plaintiff himself could not find an oral surgeon after the

first one declined to reschedule his initial surgery, and he finally gave up and went to the hospital for a referral. This first ten-day delay does not, without more, amount to deliberate indifference to Plaintiff's constitutional rights.

The next time period at issue is September 3 to September 25. After NP Roberts evaluated re-prescribed clindamycin and chlorohexidine on September 3, Plaintiff asserts that he did not receive these medications until September 25.

The medical records submitted by Defendant definitively show that the medications were *prescribed* beginning September 3, *Ex. A to Stoutin Aff.*, Ivy Medical 000010. Even if Plaintiff failed to actually *receive* those medications until September 25, he has not pointed to a custom or policy that caused the delay. For example, if he could show the jail ordered all inmate medications from a very slow pharmacy just to save on costs, that might show deliberate indifference to inmates who need medications immediately. There is no evidence whatsoever on any sort of policy that affected the timing of Plaintiff's alleged receipt of his medications. Given the lack of any evidence on this point, it would be unreasonable to infer that Defendant had an official policy or unofficial custom of not providing inmates with medication that had already been prescribed. *See McLaughlin*, 849 F.2d at 1208. The only reasonable inference that can be drawn is that individual Ivy Medical employees may have been negligent in providing the medications to

Plaintiff in a timely manner, which is insufficient either for *Monell* liability (or

individual liability, if Plaintiff had asserted such claims).

Overall, the medical records reveal that every time Plaintiff sought medical

care, an Ivy Medical staff member quickly responded. Plaintiff's disagreement

with the medical providers' treatment decisions does not constitute evidence of an

unconstitutional policy or custom. The Court will grant summary judgment on this

first claim.

ii.      Defendant's Alleged Pain-Medication Policy or Practice Does
         Not Amount to Objective Deliberate Indifference

Plaintiff contends that medical staff denied him narcotic medication between

the date of his incarceration, August 22, 2019, and the date of his second surgery,

November 6, 2019. He asserts that an Ivy Medical practice was the sole basis for

that denial, amounting to deliberate indifference.

Plaintiff asserts a medical staff person told him on October 29, 2019, that

Ivy Medical had a general prohibition on the use of narcotic prescription

medication at the jail. But Plaintiff has not shown that this was, in fact, a practice,

policy, or custom by pointing to evidence that no inmate was prescribed narcotics

about the same time period he was incarcerated at the jail.

Rather, Defendant Ivy Medical has presented evidence that its "practice"

regarding inmate pain management is simply one of limited use of opioids and of

initial preference toward non-narcotic pain medications. That practice is succinctly described by Dr. Stoutin as follows:

> As the owner of, and medical director for, Ivy Medical, I am familiar with Ivy Medical and jail policies regarding the distribution of narcotic pain relief medication in the jail facility. *It is common practice to not prescribe or distribute narcotic pain medications, including Percocet and Tramadol, to inmates absent an acute injury or an immediate post-surgical need. When narcotic medication is indicated, it is typically only prescribed for three to five days.*

*Stoutin Aff.*, ¶ 6. Plaintiff has provided no evidence showing this is not the practice of Ivy Medical. In fact, opioids were prescribed by jail medical staff to Plaintiff after his second surgery from November 6 to November 25, 2019, at which time his oral surgeon discontinued the prescription because of Plaintiff's progress in healing from the surgery.

Neither has Plaintiff shown that the policy was applied to him out of deliberate indifference between his first date of incarceration and his second surgery. There are many reasons why narcotics should not be prescribed as an initial pain medication, particularly in an institutional setting, where inmates often barter for prescription medication. Such commonly-known reasons include the risk of serious side effects of narcotic medication, the relative effectiveness of opioids when compared with non-narcotic pain medication, and the risk of dependency and

addiction—a particularly relevant consideration here, as Plaintiff was a methamphetamine user before his incarceration.

The following cases, though not precedential, represent the general trend in litigation regarding institutional narcotic or opioid prescriptions. In *Garcia v. Riaz*, the U.S. District Court for the Eastern District of California discussed a March 15, 2016 "Morbidity and Mortality Weekly Report," published by the Centers for Disease Control and Prevention. 2019 WL 415043, at *2–3 (E.D. Cal. Feb. 1, 2019) (unpublished). The report contained the following notable conclusions: (1) there was no evidence of a long-term benefit of opioids for a patient's pain and function; (2) extensive evidence showed that opioids are potentially harmful; and (3) extensive evidence "suggests some benefits of non-opioid pharmacologic treatments compared with long-term opioid therapy." *Id*.

The same district court had previously recognized concerns regarding opioid use for pain management, particularly with respect to tramadol. *See Elliott v. Tseng*, 2014 WL 3966377, at *5 (E.D. Cal. Aug. 13, 2014) (unpublished). Because evidence had shown "a severe risk of tolerance, dependence, and addiction to Tramadol," state prison health care guidelines in 2014 "recommended that tramadol be prescribed only for a short time, generally not longer than ten days, and only if severe pain with objective evidence of injury exists." *Id*. Medical providers were instructed by the guidelines "to consider opioids only if patients are

unresponsive to non-opioid analgesics and non-narcotic 'adjuvant' medications, and only in the presence of 'objective evidence of severe disease' as demonstrated by imaging tests, EMG, lab studies and/or direct examination." *Id*.

The court also recognized that "the risk of addiction to opioids in patients with a history of substance abuse is higher than it is in patients without such a history, and a history of substance abuse is therefore a factor to be considered in the decision to prescribe opioids or opioid agonists." *Id*. Finally, evidence had shown that "chronic opiate use may cause adverse side effects, including endocrine dysfunction, immunosuppression and infectious disease, opioid-induced hyperalgesia and xerostomia, overdose, falls and fractures, and psychosocial complications." *Id*.

In *DeGeorge v. Mindoro*, the Northern District of California considered a claim that the failure to prescribe morphine amounted to deliberate indifference. 2019 WL 2123590, at *7 (N.D. Cal. May 15, 2019) (unpublished). That court noted "compelling evidence justifying [the] decision to prescribe plaintiff a plain medication other than morphine":

> First, [the defendants' treatment decision] is supported by recent medical studies showing, and by growing awareness by the medical community of, the dangers posed by opioids. Indeed, multiple courts, including this one, have recognized the dangers of opioid abuse. *See Hadden v. Adams*, No. 16-CV-02686 LHK (PR), 2018 WL 6438362, at *1 (N.D. Cal. Dec. 7, 2018) ("Narcotic pain medications may be useful but may also sometimes

be ineffective.... Prescribing opioids carries risks, however, such as addiction, abuse, and other adverse side effects."); *see also United States v. Garrison*, 888 F.3d 1057, 1059 (9th Cir. 2018) ("There is now an epic crisis of deadly opioid abuse and overuse.... the Acting Secretary of Health and Human Services declared the national opioid abuse epidemic a public health emergency."). Second, plaintiff's growing resistance to morphine … also supports defendants' treatment decision. Third, plaintiff was able to carry on with the activities of his daily life, which suggests that continuing his morphine prescription presented an unjustifiable risk. Under these circumstances, defendants' decision to wean plaintiff off morphine does not appear to be medically unacceptable.

*Id*. (internal record citations omitted).

These compelling concerns about the opioid crisis[11] are not limited to the Eighth Amendment context and apply equally to the dangers of opioids used by pretrial detainees. Given the growing scientific evidence regarding the problems of using narcotics for pain management, Plaintiff's desire for such medication does not establish that Defendants' pain-medication policy—which prefers non-narcotics and resorts to opioids rarely and out of dire necessity—amounts to objective deliberate indifference to inmates' serious medical needs. *See Gordon*, 888 F.3d at 1124–25. That Plaintiff felt he needed additional or different pain

---

[11] The Court also takes judicial notice that, on October 24, 2018, then-President Trump signed the Opioid Crisis Response Act into law, to address to the ongoing opioid crisis in the United States. *See* S. Res. 2680, 115th Congr. (2018) (enacted).

medication shows only a disagreement between the parties as to the risks and benefits of treating Plaintiff's pain with narcotics.

Defendant has met its burden of showing that its practice of prescribing narcotics only in special situations does not amount to objective deliberate indifference in violation of the Due Process Clause or the Eighth Amendment. Therefore, the burden shifts to Plaintiff to raise a genuine dispute as to whether failing to treat Plaintiff's pain from his first surgery with opioids from August to October 2019 (Plaintiff was in fact prescribed tramadol in November directly after the second surgery) occurred because of a policy or practice amounting to objective deliberate indifference. Plaintiff has failed to do so. He offers his opinion that Defendant's policy is unconstitutional but provides no evidence to support it.

Consequently, Defendant is entitled to summary judgment on Plaintiff's pain-medication policy claim.

> iii.     The Policy that Inmates Generally Must Purchase OTC Medication, Such as Tylenol and Ibuprofen, from the Commissary Is Not Objectively Deliberately Indifferent as Required by *Monell*

Plaintiff alleges that Defendant has "a policy or practice of denying inmates pain medications and telling them to purchase the needed medications from commissary." *Stmt. of Disp. Facts* at 7. The record reflects that several medical providers advised him to buy OTC medications to treat his pain as needed. Therefore, Plaintiff has identified a policy, but that is not enough.

Plaintiff's assertion that it is unconstitutional for inmates to have to purchase non-prescription pain relievers instead of receiving them all free-of-charge is unsupported by the law. It is well-established that non-indigent prisoners may, consistent with the Constitution, be required to pay for medication and other medical care. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 408 (9th Cir. 1985) (holding that a $3.00 co-pay fee for prisoners cannot be construed as deliberate indifference to inmates' medical needs). Because Plaintiff does not provide any evidence that he was indigent and denied medication as a result of this policy when he was held in the Twin Falls County Jail, Defendant is entitled to summary judgment on his OTC-policy claim.

      iv.      <u>No Evidence Shows a Custom or Practice of Relying on a Nonexistent Transportation Policy to Avoid Sending Plaintiff to an Out-of-County Medical Provider</u>

Plaintiff's final claim is based on LPN Benedict's belief that the jail had a policy prohibiting the transport of inmates out of Twin Falls County for medical purposes. Plaintiff has presented evidence, in the form of his own testimony, that no such policy existed because inmates are, indeed, transported across county lines to attend medical appointments.[12] Thus, Benedict either was wrong about the

---

[12] Additionally, evidence shows that Plaintiff himself was transported out-of-county to Hailey—a town in Blaine County—for a medical appointment on October 28, 2019.

existence of a transportation policy or deliberately tried to mislead Plaintiff when she told him he had to be seen by a local, in-county provider.

To survive summary judgment, Plaintiff must show that Ivy Medical itself had a custom or policy of lying to inmates about a nonexistent jail policy prohibiting transportation of inmates across county lines for medical appointments. It is unclear why Ivy Medical would have any interest in perpetuating such a lie. For example, Plaintiff has not shown that Ivy Medical paid for inmate transportation, or that out-of-county medical providers were more expensive for Defendant to fund (if, in fact, Ivy was required to pay for outside providers as a result of its contract with the jail). Plaintiff has not provided any other examples of inmates who faced this same problem with Ivy Medical. There is no discernible pattern in the record showing that Ivy Medical regularly refused to transport inmates to out-of-county medical providers in instances where no in-county specialists were available to treat their medical conditions. Without any evidence that there was such a policy, Plaintiff cannot survive summary judgment. Therefore, Defendants are entitled to summary judgment on his transportation claim.

**C.**   ***Even If Defendant Did Have a Deliberately Indifferent Policy or Custom, No Evidence Suggests that Such a Policy or Custom Necessitated Plaintiff's Second Surgery***

In addition to the fact that there is no evidence of a deliberately indifferent policy or custom on the part of Ivy Medical, there is also no evidence that Plaintiff's medical treatment following his first jaw surgery actually caused the need for the second jaw surgery. *See Mabe*, 237 F.3d at 1111 (policy must be the "moving force behind the constitutional violation") (internal quotation marks omitted).

There is no expert testimony that the second jaw surgery would not have been required if Ivy Medical providers had provided more, different, or faster medical treatment. Plaintiff's own beliefs as to why he needed the second surgery are insufficient to create a genuine dispute as to material fact. Therefore, even if Defendant had a deliberately indifferent policy or practice, it still would be entitled to summary judgment.

## CONCLUSION

Defendant has met its initial burden to show that, even though it does have some practices or policies that relate to the claims at hand, none of them amounts to objective deliberate indifference by recklessly or intentionally delaying or denying treatment for Plaintiff's serious medical needs. Finally, Defendant has

shown that there is no evidence supporting an inference that Plaintiff's jail medical treatment necessitated the second surgery.

Because Plaintiff has had adequate opportunity and time to conduct discovery but has not rebutted Defendant's showing, the Court will grant Defendant's Motion for Summary Judgment.

## ORDER

**IT IS ORDERED:**

1.   Plaintiff's Motion to Amend Civil Rights Complaint (Dkt. 34) is DENIED.

2.   Plaintiff's Motion to Strike Discovery (Dkt. 35) is DENIED.

3.   Defendant's Motion to Strike Plaintiff's Statement of Facts (Dkt. 33) is DENIED.

4.   Defendant's Motion to Strike Plaintiff's Sur-reply (Dkt. 41) is DENIED.

5.   Defendant's Motion for Summary Judgment (Dkt. 20) is GRANTED, and this case is DISMISSED with prejudice.

DATED: March 14, 2022

B. Lynn Winmill
U.S. District Court Judge